IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
May 2007 Session

**STATE OF TENNESSEE v. VICTOR EUGENE TYSON**

**Direct Appeal from the Criminal Court for Davidson County**
**No. 97-D-2569     Seth Norman, Judge**

**No. M2006-01652-CCA-R3-CD** - Filed July 10, 2007

The Defendant, Victor Eugene Tyson, was convicted by a Davidson County jury of second degree murder, attempted first degree murder, and felony murder. On appeal, the Defendant alleges the evidence is insufficient to sustain his convictions. Finding no error, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and D. KELLY THOMAS, JR., JJ., joined.

Paul J. Bruno, Nashville, Tennessee, for the Appellant, Victor Eugene Tyson.

Robert E. Cooper, Jr., Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; Dan Hamm and Deborah Housel, Assistant District Attorneys General, for the Appellee, State of Tennessee.

**OPINION**
**I.  Facts**

This case arises from the murder of Derrick King and the attempted murder of Jay King. The following evidence was presented at the Defendant's trial: Jay King testified that he knew the Defendant in 1996 through his older brother. On the night of August 2, 1996, he saw the Defendant at an Amoco gas station while he was pumping gas. Jay King stated that the Defendant pulled up with another man, and they were looking at him. Jay King asked what they were looking at, and they "exchanged words." Jay King then got into his SUV, a black GMC Yukon, and proceeded to drive off, but the Defendant kept saying things. Jay King stopped, exited the vehicle, and as he turned around, someone whom he did not see began shooting at him. Jay King's passenger, Marshall, returned fire. The Defendant fled on foot, and Jay King and Marshall drove away in his SUV.

Jay King testified that he called his brother, who planned to contact other friends who would

bring a number of guns over in order to retaliate. He arrived at his residence on Clifton Avenue and remained on his porch with a number of family members and friends, including his cousin Derrick King. In the early morning hours of August 3, 19966, while individuals congregated on his porch and front lawn, Jay King noticed a car driving by after switching off its lights. Shots were fired from the car, and he attempted to pull Derrick King behind a nearby car. However, Derrick King had already been shot in the head. Jay King stated that he did not believe anyone in his group was armed because they were waiting on the weapons to arrive. At some point, Corey King, Jay King's younger brother, shot back at the car, but he could not remember whether it was during the shooting or after the car pulled away.

Jay King testified that the two cars involved both appeared to be Chevrolet Impalas, one gray and one yellow. Jay King stated that there were a number of people shooting at him, but he could only identify the Defendant. He stated that no one got out of the vehicles, and the vehicles did not stop. The police were called, and Derrick King was taken by ambulance to the hospital.

On cross-examination, Jay King testified that he had heard of Kendall, J.J., and John Steel, and he stated that he had heard they were also involved in the shooting. Jay King admitted that he had heard of Darrell and Shawn McQuiddy because they were drug dealers, and he was also in the drug business at that time. Jay King stated that after he and his friend, Marshall, had been shot at while at the Amoco, they got into his GMC Yukon, and he drove toward the Defendant while Marshall was shooting at him. They believed the Defendant was the person who shot at them first. In describing the shooting at the Clifton house, Jay King stated that the first car that came by appeared to be silver with a yellow hood. The Defendant was in the silver car, with three other people. There may have been four people in the second car, but he could not be sure. Jay King stated that he was taken to an impound lot where he identified the gray and yellow 1975 Chevrolet Caprice that was used in the shooting.

Ernest Eugene King testified that he was Jay King's cousin and Derrick King's uncle. Ernest King stated that he was at the Clifton residence the morning of August 3, 1996, when two cars drove by, shooting at the house. He, along with everyone else there, took cover, so he could not recall many details about the two cars, except that one was yellow. After the shooting, everyone got up except Derrick King. He realized Derrick King had been shot, so he called 911 and then attempted to render aid. Derrick King died at the hospital. Ernest King discussed the shooting with the police, and later gave a statement at the police station. On cross-examination, Ernest King testified that he did not know the color of the first car that drove by, but he identified the second car as what appeared to be a yellow Chevrolet Malibu. Ernest King was also taken to the impound lot, but he did not identify either of the cars used in the shooting.

Corey King testified that, at some point on the evening of August 2, 1996, he was sent to retrieve a number of weapons for his family members, including Jay King. After he brought a bag of guns, he and other family members were standing in the front yard of their house on Clifton Avenue when a car drove by shooting at them. Corey King could not remember if there was more than one car, but he recalled shooting at the back of a yellow vehicle. The reason he went to gather

2

the weapons was because of an incident earlier in the evening between the Defendant and Jay King.

Philander Jones testified that, in August of 1996, he shared a portion of a tri-plex with a drug dealer, who was a friend of his, Shawn McQuiddy. At some point in the evening of August 2, 1996, the Defendant arrived at the location, and the three discussed the fact that the Defendant and Jay King had just "gotten in to it" at the Amoco gas station. The Defendant showed the two a bullet hole in his shoe, but he was otherwise uninjured and calm. About fifteen minutes after the Defendant arrived, Darrell McQuiddy, Shawn McQuiddy's brother, arrived after Shawn called him and asked him to come by. As the four were standing outside, another car pulled up with three men Jones had never met before, but whom Shawn McQuiddy appeared to know. Jones saw one carrying an Uzi or an AK-47 assault rifle.

Jones testified that he went inside the house, turned off the lights and the TV, and when he returned to the sidewalk, Darrell McQuiddy and the Defendant got into a black two-door Cadillac, and he and Shawn McQuiddy got into Shawn's red Corvette. The three unknown individuals drove a brown Oldsmobile. Jones stated that everyone saw Jay King's black GMC Yukon drive down an alley, and they went after him. The Cadillac led, with the Oldsmobile and then the Corvette following behind. The Corvette, which Jones was riding in, was split up from the other two cars, and once they were able to catch up with the first two cars, Jones saw the cars' lights go out, and gunfire erupted. Jones could not tell how many shots were fired, how many guns were used, or where the shots came from. Shawn McQuiddy turned off and dropped Jones at Jones's house. Jones did not know anyone had been killed, and he had merely expected to beat-up Jay King.

On cross-examination, Jones testified that Shawn McQuiddy was the first person to arrive at his residence. The Defendant arrived next, followed by Darrell McQuiddy, who was called to the house by Shawn McQuiddy. These four were followed by the three unknown men in a brown Oldsmobile. Jones did not have a gun, and he did not see the Defendant or Shawn McQuiddy with a gun. He knew Darrell McQuiddy had a gun in his car, but he was not carrying it. One of the men in the brown Oldsmobile carried a gun. When the group left, Jones was not under the impression that they were going to kill anyone. Jones was never charged with anything associated with this killing. Jones explained the car he was in, the red Corvette, turned off Clifton Avenue immediately after the shooting took place. He was not in one of the two cars from which shots were fired.

Darrell McQuiddy testified that he had already pled guilty to facilitation of first-degree murder in this case. On August 3, 1996, the Defendant called to tell him that he and Jay King had "gotten into it" at the Amoco gas station. The Defendant asked him to come to the triplex on 16th Avenue. When he arrived, Eric Brown, Shawn McQuiddy, Philander Jones, Kendall, John Steel, and DeAndrea were there. The group was talking, and the Defendant told him that he and Jay King got into a shootout at the Amoco, and the Defendant wanted to handle it. That meant they were going to kill him. Darrell McQuiddy stated he had a .45 caliber revolver, and the Defendant had a .9 millimeter pistol. Darrell McQuiddy and the Defendant left in his black Cadillac El Dorado, with the Defendant in the passenger seat. Shawn McQuiddy and Philander Jones also left in Shawn McQuiddy's red Corvette. The other three people left in an older model beige car. When they left

3

Darrell McQuiddy believed everyone had guns, and he saw many of them when the shootout started. At some point in the drive, Darrell McQuiddy called his brother and told him to turn off. The beige car followed the black El Dorado past Jay King's house, where they spotted Jay King's black GMC Yukon. The two cars met up to formulate a plan, and they went back to Jay King's house and began shooting. The Defendant shot his .9 millimeter until it was empty. When the individuals in the other car also ran out of bullets, they pulled off with the black Cadillac El Dorado following behind.

On cross-examination, Darrell McQuiddy stated that, at the time of the killing, the Defendant drove a 1994 gold Cadillac. There were, however, some times when the Defendant drove Darrell McQuiddy's 1974 gray Chevrolet Caprice. That car was not driven the night of the shooting. Darrell McQuiddy stated that he did not see Kendall or John Steel's guns until they opened fire on Jay King. One appeared to be shooting an assault rifle, perhaps an AK-47. Darrell McQuiddy could not see what type of gun the other man was using. The Defendant shot his .9 millimeter more than five times, and the casings were cast out into the street because the Defendant's arm was out the window. The other two men had opened their car doors and were shooting while standing out side the car.

Officer George Bouton, with the Nashville Police Department, testified that his job in 1996 was as a crime scene investigator. When he arrived at the house on Clifton Avenue, Officer Bouton sketched a diagram of the scene, which was later reproduced with the aid of a computer. He testified that all fifteen shell casings found at the scene came from a .9 millimeter gun.

Dr. Bruce Phillip Levy, the Davidson County Medical Examiner, testified that Dr. Miles Jones performed an autopsy on Derrick King and determined that he died from a gunshot wound to the head. Dr. Levy stated that death was practically instantaneous. On cross-examination, Dr. Levy stated that the bullet was fired from a distance, and he would not consider it an intermediate range shot.

Lieutenant Dewayne Phillips testified that he was the supervising detective of the investigation of the crime on Clifton Avenue He stated he arrived at the scene at about 1:55 a.m. on August 3, 1996. At some point in the night, the Defendant's name came up as a possible suspect. Lieutenant Phillips stated he believed only .9 millimeter casings were found at the scene, and any casings from the .38 revolver found at the scene must have been disposed of manually, as the .38 was found empty and revolvers do not automatically eject spent casings.

Detective Danny Satterfield testified that he arrived on the scene, made a visual inspection, and began to interview the witnesses. During the course of the interviews, the Defendant emerged as a possible suspect. Detective Satterfield later set up a photo line-up, in which Jay King positively identified the Defendant as a shooter. The casings found at the scene were not compatible with the .38 revolver also found. On cross-examination, Detective Satterfield stated that only .10 millimeter and .40 caliber shell casings were found at the Amoco. After the Defendant was arrested in his 1975 yellow and gray Chevrolet Caprice, four witnesses were taken to the impound lot, and only one, Jay King, was able to identify the car.

Based on this evidence, the Defendant was convicted of second degree murder, attempted first degree murder, and felony murder based on the attempted first degree murder. The trial court merged the second degree murder and felony murder convictions.

## II. Analysis

On appeal, the Defendant contends that there was insufficient evidence to convict him of attempted first degree murder and, thus, felony murder. When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

First degree murder is, in part, defined as "a premeditated and intentional killing of another."

5

T.C.A. § 39-13-202 (1997). Premeditation may be established by any evidence from which a rational trier of fact may infer that the killing was done "after the exercise of reflection and judgment" as required by Tennessee Code Annotated section 39-13-202(d). *State v. Leach*, 148 S.W.3d 42, 53 (Tenn. 2004) (citing *Davidson*, 121 S.W.3d at 615). The element of premeditation is a question for the jury and may be established by proof of the circumstances surrounding the killing. *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997). The Tennessee Supreme Court previously has identified the following circumstances as supporting a finding of premeditation: the use of a deadly weapon upon an unarmed victim; the particular cruelty of a killing; the defendant's threats or declarations of intent to kill; the defendant's procurement of a weapon; any preparations to conceal the crime undertaken before the crime is committed; destruction or secretion of evidence of the killing; and a defendant's calmness after a killing. *See Id.* (citing *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997)). However, these factors are not exhaustive. *Davidson*, 121 S.W.3d at 615. Establishment of a motive for the killing is a factor from which the jury may infer premeditation. *State v. Nesbit*, 978 S.W.2d 872, 898 (Tenn. 1998).

Criminal attempt is defined as follows:

A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:

(1) Intentionally engages in action or causes a result that would constitute an offense if the circumstances surrounding the conduct were as the person believes them to be;

(2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or

(3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step towards the commission of the offense.

T.C.A. § 39-12-101 (1997). Subsection (2), under which the Defendant was presumably convicted, addresses the situation where one does some act, with the appropriate intent, that would cause an element of the offense to be satisfied without the person doing anything else (i.e., pulling the trigger on a gun while aiming it at someone). *See State v. Elder*, 982 S.W.2d 871, 875 n.2 (Tenn. Crim. App. 1998) (describing the criminal attempt subsections).

The evidence in this case, viewed in the light most favorable to the State, showed the Defendant and Jay King became embroiled in a shootout sometime in the early evening of August 2, 1996 at a local Amoco gas station. They both came away unharmed, and the Defendant proceeded

to meet with a number of his friends. The Defendant planned to "handle it" with Jay King by finding him and killing him. The group left in three cars, and, after one car pulled off, the Defendant, driven by Darrell McQuiddy, pulled up to Jay King's house and began shooting at him and the group of people standing with him.

This proof is sufficient to sustain a conviction for attempted first degree murder. In addition to the direct evidence that the Defendant stated he wanted to "handle it," the jury could infer premeditation because the Defendant had a motive to kill Jay King: they were involved in a shootout earlier that day. The elements of criminal attempt are satisfied by the evidence that the Defendant fired upon the crowd gathered at Jay King's residence. Thus, there was sufficient evidence upon which to convict the Defendant of attempted first-degree murder.

As to the Defendant's conviction for felony murder, the Defendant may be convicted if "A killing of another [is] committed in the perpetration of or attempt to perpetrate any first degree murder . . . ." T.C.A. § 39-13-202(b). The evidence at trial showed the killing of Derrick King occurred as a result of the Defendant shooting into the group of people that he believed Jay King to be standing in. Having found the Defendant was properly convicted of attempted first degree murder, we conclude there is sufficient evidence upon which a rational jury could conclude the killing of Derrick King occurred during the attempt to perpetrate the first degree murder of Jay King.

The Defendant urges us to consider the fact that there were numerous discrepancies between the evidence offered by the State's witnesses. Primarily, Jay King, Eugene King, and Corey King all testified that there was a yellow car involved, while Jones and McQuiddy testified that there was not. Additionally, there were inconsistencies between Jones and McQuiddy's testimony as to who arrived at the 16th Avenue house and when they arrived. However, it is the responsibility of the jury to make credibility determinations and to resolve questions of fact. *See Bland*, 958 S.W.2d at 659. An inherent aspect of this responsibility is the ability to accept portions of testimony while rejecting others. Our task is to analyze if the evidence, viewed in the light most favorable to the State, without considering factual disputes, provides the factual basis for the elements of the offenses. In that light, there is sufficient evidence to convict the Defendant of attempted first-degree murder and felony murder. Accordingly, the Defendant is not entitled to relief on this issue.

### III. Conclusion

In accordance with the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE

7